E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section
ZAKARIYA K. VARSHOVI[1]
Assistant United States Attorney
     Federal Building, Suite 7516
     300 North Los Angeles Street
     Los Angeles, California 90012
     Telephone: (213) 894-3994
     Facsimile: (213) 894-7819
     E-mail: Zakariya.Varshovi@usdoj.gov
*Attorneys for Defendants Merrick Garland,*
*Anne Milgram, United States Department*
*of Justice, and the Drug Enforcement*
*Administration*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

|  |  |
|---|---|
| DR. DAVID BOCKOFF,<br><br>*Plaintiff,*<br><br>v.<br><br>MERRICK GARLAND, et al.,<br><br>*Defendants.* | No. 2:22-cv-09046-SB-KS<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER**<br><br>[*Declaration of Vanea A. Morrell filed concurrently herewith*]<br><br>Honorable Stanley Blumenfeld |

---

[1]  Admitted to practice under Local Rule 83-2.1.4.1.  *See* Order, In Re Application of Zakariya K. Varshovi for Admission Pursuant to Local Rule 83-2.1.4.1, No. 2:22-cm-00014-PSG (C.D. Cal. Feb. 2, 2022).

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................. 1

II.   BACKGROUND ................................................................. 3

    A.    The Controlled Substances Act. ................................................. 3

    B.    Suspension of Dr. Bockoff's Registration. ..................................... 4

    C.    Dr. Bockoff's Expedient Pursuit of Administrative Remedies.................... 6

    D.    Dr. Bockoff's Belated Pursuit of a TRO. ...................................... 7

III.  ARGUMENT ................................................................... 7

    A.    Dr. Bockoff Does Not—*And Cannot*—Show Irreparable Harm. ................ 8

    B.    Dr. Bockoff is Not Likely to Succeed on the Merits. ............................ 11

    C.    The Balance of Equities Do Not Tip in Dr. Bockoff's Favor, And A Mandatory Injunction Disserves the Public Interest. ................................. 14

IV.   CONCLUSION ................................................................. 16

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ............................................................. 11, 14

*American Tunaboat Ass'n. v. Brown,*
  67 F.3d 1404 (9th Cir. 1995) ...................................................................... 10

*Anderson v. United States,*
  612 F.2d 1112 (9th Cir. 1980) ....................................................................... 8

*Cal. Trucking Ass'n v. Bonta,*
  996 F.3d 644 (9th Cir. 2020) ........................................................................ 7

*Cardinal Health, Inc. v. Holder,*
  846 F. Supp. 2d 203 (D.D.C. 2012) ...................................................... 12, 15

*City & Cnty. of San Francisco v. Purdue Pharma L.P.,*
  No. 18-cv-07591, 2022 WL 3224463 (N.D. Cal. Aug. 10, 2022) ............................. 5

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC,*
  710 F.3d 579 (5th Cir. 2013) ........................................................................ 9

*Defs. of Wildlife v. Zinke,*
  856 F.3d 1248 (9th Cir. 2017) ..................................................................... 12

*Drakes Bay Oyster Co. v. Jewell,*
  747 F.3d 1073 (9th Cir. 2014) ....................................................................... 7

*Evergreen Pharmacy, Inc. v. Garland,*
  No. 22-cv-3912, 2022 WL 3294842 (N.D. Ill. Aug. 11, 2022) ......................... 12, 14

*Friends of the Santa Clara River v. United States Army Corps of Eng'rs,*
  887 F.3d 906 (9th Cir. 2018) ...................................................................... 14

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) .................................................................. 9, 10

*Immigrant Legal Res. Ctr. v. City of McFarland,*
  827 F. App'x 749 (9th Cir. 2020) ........................................................... 10, 11

*In re Purdue Pharma, L.P.,*
  635 B.R. 26 (S.D.N.Y. 2021) ................................................................... 4, 15

*Keysource Med., Inc. v. Holder,*
  No. 11-cv-393, 2011 WL 3608097 (S.D. Ohio Aug. 16, 2011) ............................ 15

*Keywords, LLC v. Internet Shopping Enters.,*
  No. 5-cv-2488, 2005 WL 8156440 (C.D. Cal. June 29, 2005) ........................... 10

*Lockheed Missile & Space Co. v. Hughes Aircraft Co.,*
  887 F. Supp. 1320, 1323 (N.D. Cal. 1995) ....................................................... 7

**Cases (continued)** **Page(s)**

*Los Angeles Memorial Coliseum Comm'n. v. National Football League,*
634 F.2d 1197 (9th Cir. 1980) ........................................................ 10

*Lydo Enters., Inc. v. City of Las Vegas,*
745 F.2d 1211 (9th Cir. 1984) ..................................................... 9, 10

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
571 F.3d 873 (9th Cir. 2009) ............................................................ 8

*Medipharm-Rx, Inc. v. Gonzales,*
No. 6-cv-2223, 2006 WL 3842205 (M.D. Fla. Dec. 8, 2006) ................................ 15

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
886 F.3d 803 (9th Cir. 2018) .......................................................... 11

*Nken v. Holder,*
556 U.S. 418 (2009) ................................................................... 7

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.,*
762 F.2d 1374 (9th Cir. 1985) .......................................................... 9

*Robinson v. Alameda County,*
875 F. Supp. 2d 1029 (N.D. Cal. 2012) .................................................. 9

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
747 F.3d 581 (9th Cir. 2014) .......................................................... 14

*Senior Care Pharmacy Servs. v. Express Scripts, Inc.,*
No. 21-cv-97, 2021 U.S. Dist. LEXIS 14433 (C.D. Cal. Jan. 25, 2021) ................. 11

*Winter v. NRDC, Inc.,*
555 U.S. 7 (2008) ................................................................... 7, 8

*Zhenhua Logistics (H.K.) Co. v. Metamining, Inc.,*
No. 13-cv-2658, 2013 WL 3360670 at *1 (N.D. Cal. July 3, 2013) ........................ 9

**<u>Statutes</u>**

21 U.S.C. § 801 .................................................................... 3, 14
21 U.S.C. § 812 ..................................................................... 1, 3
21 U.S.C. § 822 ........................................................................ 3
21 U.S.C. § 823 ..................................................................... 3, 6
21 U.S.C. § 824 ................................................................... *passim*

**<u>Regulations</u>**

21 C.F.R. § 1300 ...................................................................... 3
21 C.F.R. § 1301.36 ................................................................... 4
21 C.F.R. § 1301.37 ................................................................. 3, 4

# I.    INTRODUCTION

Six weeks ago, the Drug Enforcement Administration (DEA) hand-served Dr. David Bockoff with an Immediate Suspension Order (ISO) because he posed an imminent danger to the public health or safety.  Six weeks later, Dr. Bockoff barreled into this Court *ex parte* to seek emergency relief lifting the ISO and upending the ongoing DEA administrative proceedings that he has actively participated in. There is no such emergency.  Instead, Dr. Bockoff asks for extraordinary relief so he may resume his business of prescribing Schedule II opioids in extraordinarily high dosages, including fentanyl and oxycodone, long recognized as having "a high potential for abuse" leading to "severe psychological or physical dependence."  21 U.S.C. § 812(b).  For the reasons below, Dr. Bockoff fails to meet his high burden to demonstrate that he is entitled to a mandatory temporary restraining order (TRO).

*First*, Dr. Bockoff does not—*and cannot*—show irreparable harm.  At the outset, Dr. Bockoff has another adequate remedy at law.  Since November 4, 2022, Dr. Bockoff has been actively engaged in administrative proceedings to restore his registration, through his legal counsel, with a multi-day hearing before the DEA set to begin on January 19, 2023.  Courts in and outside the Ninth Circuit regularly find that where—as here—a party has an adequate remedy at law, irreparable harm is absent.  This alone defeats Dr. Bockoff's TRO request.  Conversely, the DEA hand-served the ISO to Dr. Bockoff *over six weeks ago*—yet only now does he burst into this Court seeking emergency relief that he suddenly argues is urgent, while offering no explanation for his prolonged delay in seeking it.  The Ninth Circuit has repeatedly held that where—as here—a party delays seeking emergency relief, that delay demonstrates the opposite of irreparable harm. Likewise, Dr. Bockoff relies almost exclusively on alleged patient harms and conclusory assertions of his own financial harm.  But the Ninth Circuit has held that a party seeking injunctive relief must demonstrate genuinely irreparable harm to himself—not to third parties.  Nor can his unsupported and cursory claim of economic hardship suffice to prove irreparable harm. A doctor who has been practicing for decades could normally maintain

1

his business if the DEA's administrative proceedings are resolved in his favor.  And a plaintiff's decision not to adequately finance his own business during those proceedings is the opposite of irreparable harm.

*Second*, Dr. Bockoff falls well short of establishing that the DEA's issuance of the ISO is arbitrary and capricious—as he must—to show that he will likely succeed on the merits.  The Ninth Circuit has made clear that the arbitrary and capricious standard is highly deferential, entitling the DEA to a presumption of regularity and foreclosing insertion of the Court's judgment for that of the DEA.  Dr. Bockoff inaccurately and misleadingly characterizes the ISO as if it were a minor matter of criticizing his shoddy recordkeeping.  To the contrary, the DEA's ISO reflects an exhaustive review of ***over three years' worth*** of Dr. Bockoff's records, which demonstrated that he repeatedly prescribed the most dangerous drugs ***without*** conducting an appropriate medical evaluation, ***without*** appropriately establishing a medical justification, ***without*** proper medical records, ***without*** establishing appropriate medical necessity, and ***without*** conducting proper ongoing monitoring of his patients.  Put simply, the ISO resoundingly shows a rational connection between facts found and conclusions made.

*Finally*, courts have repeatedly recognized that the government has a strong interest in enforcing the Controlled Substances Act and ensuring that controlled substances are not improperly diverted amid ongoing administrative proceedings before the DEA.  This case is no exception.  Such interests heavily outweigh any hardships Dr. Bockoff might personally suffer as a result of the ISO.  At the same time, Dr. Bockoff's failure to genuinely confront the ISO's alarming evidentiary findings demonstrates that lifting the ISO would undermine, not serve, the public interest.  Indeed, Dr. Bockoff admits he intends to resume his unsafe prescribing practices, while offering self-serving "aspirational improvements" to take better patients notes.  And while Dr. Bockoff suggests he is the *only* opiate option for his patients from all across the country—since apparently no other doctor will prescribe opiates for them—that suggestion undercuts his arguments on the merits (indeed, the United States currently remains near the top of the world in its

2

per-capita opiate prescription rates[2]).  At bottom, any hardships Dr. Bockoff faces are minimized by the expeditious administrative remedies he has been pursuing and are ultimately of his own making: he prescribed Schedule II opioids in extraordinarily high dosages while offering no basis, nor any supporting records, justifying such practices.

Accordingly, the Court should deny Dr. Bockoff's request for a TRO.

## II.     BACKGROUND

### A.     The Controlled Substances Act.

The Controlled Substances Act (CSA) and its implementing regulations govern the manufacture, distribution, and dispensation of controlled substances.  21 U.S.C. §§ 801, *et seq.*; 21 C.F.R. §§ 1300, *et seq.*  The CSA categorizes controlled substances into five schedules based on a drug's risk profile and accepted medical uses.  Relevant here, Schedule II drugs—which have "a high potential for abuse," leading to "severe psychological or physical dependence"—are the most dangerous drugs that may be dispensed.  21 U.S.C. § 812(b).  Prescription opioids such as fentanyl, oxycodone, morphine, and methadone are Schedule II drugs.  Schedule III, IV, and V drugs have moderate to low potential for abuse.

Every person or entity that manufactures, distributes, prescribes, or dispenses controlled substances must apply for registration with the DEA.  21 U.S.C. § 822.  The DEA "shall register an applicant" unless it determines "that the issuance of such registration is inconsistent with the public interest."  *Id.* § 823.  The DEA has authority to revoke or suspend a party's registration for a variety of reasons, including that a registrant has "committed such acts," rendering his registration "inconsistent with the public interest."  21 U.S.C. § 824(a)(4).  But before suspending or revoking a registration, the DEA must issue an order to show cause explaining "the legal basis for such hearing and for the denial, revocation, or suspension of registration and a summary of the matters of

---

[2] Sahan Jayawardana, et al., *Global consumption of prescription opioid analgesics between 2009-2019: a country-level observational study*, ECLINICALMEDICINE (Nov. 2021), *available at* https://www.thelancet.com/action/showPdf?pii=S2589-5370%2821%2900479-X (last accessed Dec. 19, 2022).

3

1 fact and law asserted." 21 C.F.R. § 1301.37(c).

2      And where, as here, a registrant poses "an imminent danger to the public health or

3 safety," the DEA may simultaneously issue an immediate suspension order, suspending

4 that party's registration prior to an administrative hearing. 21 U.S.C. § 824(d); *id.* §

5 824(d)(2) (defining "imminent danger to the public health or safety" to mean "a substantial

6 likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled

7 substance will occur in the absence of an immediate suspension of the registration"). The

8 ISO "shall contain a statement of [the Administrator's] findings regarding the danger to

9 public health or safety," 21 C.F.R. § 1301.36(e), and remains "in effect until the conclusion

10 of such proceedings, including judicial review thereof, unless sooner withdrawn by the

11 Attorney General or dissolved by a court of competent jurisdiction." 21 U.S.C. § 824(d).

12 But a registrant "may request a hearing on the revocation or suspension of his/her

13 registration at a time earlier than specified in the order to show cause," and "[t]his request

14 shall be granted by the Administrator, who shall fix a date for such hearing as early as

15 reasonably possible." 21 C.F.R. § 1301.36(h).

16     **B.**    **Suspension of Dr. Bockoff's Registration.**

17      Located between West Hollywood and Beverly Hills, Dr. Bockoff since 2003 has

18 "own[ed] and operate[d] his clinic, with a primary focus on pain management." Compl. ¶

19 1. According to Dr. Bockoff's website, he does not appear to accept insurance of any kind

20 and appears to operate on a direct payment basis. *See* David B. Bockoff, M.D., pain relief,

21 http://www.losangelespainrelief.com/insurance.html ("We're sorry, we don't participate

22 in any government health plans and we are not providers and we are not "in network" with

23 any commercial insurance plans.").[3]

24      On October 25, 2022, the DEA filed an Order to Show Cause and Immediate

25 Suspension Order, immediately suspending Dr. Bockoff's DEA Registration because his

26

27      [3] Dr. Bockoff does, however, assert to the public that OxyContin is "among the most effective medications for the treatment of intractable pain." *Id.* at "Home"; *In re Purdue Pharma, L.P.*, 635 B.R. 26, 43-44 (S.D.N.Y. 2021) (describing OxyContin as "the ultimate 'gateway' drug," adding that "[b]y the early 2000's, rates of opioid addiction in connection with OxyContin use were skyrocketing throughout the country").

28

4

continued registration constitutes "an imminent danger to the public health or safety."  21 U.S.C. § 824(d).  Declaration of Vanea A. Morrell ("Morrell Decl."), ¶ 3, **Ex. A**.  The ISO contained five detailed examples showing that Dr. Bockoff repeatedly prescribed Schedule II opioids "common for diversion and abuse" in exceedingly high dosages "with no evidence of improvement in pain and function."  *Id.* at 4-8; *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 18-cv-07591, 2022 WL 3224463, at *12 (N.D. Cal. Aug. 10, 2022) (defining diversion as when controlled substances are "taken from the legitimate stream of commerce and moved into the illicit marketplace").  Contrary to the claims of Plaintiff's TRO application, the ISO clearly states that it is a "***non-exhaustive summary*** of facts and law at issue."  **Ex. A** at 1 (emphasis in original).  It provides the recipient with notice at the outset of the suspension period, rather than exhaustively specifying all facts supporting the suspension.

Alarmingly, despite the CDC's warning that patients are exposed to an increased risk of overdose when receiving opioids in daily amounts over 50 MME, *id.* at 4 n.1 (explaining that morphine milligram equivalency (MME) is a standardized metric for opioid potency), Dr. Bockoff in each instance prescribed patients opioid dosages in multiples significantly higher than 50 MME per day. *See, e.g.*, *id.* at 4 (explaining for Patient B.B., Dr. Bockoff prescribed Scheduled II opioids for a daily dose of 225 to 720 MME—up to ***over fourteen*** times CDC's risk of overdose level); *id.* at 5 (explaining for Patient E.C., Dr. Bockoff prescribed Scheduled II opioids for a daily dose of 598 to 918 MME—up to ***over eighteen*** times CDC's risk of overdose level); *id.* at 5-6 (explaining for Patient P.J., Dr. Bockoff prescribed Scheduled II opioids for a daily dose of 780 to 960 MME —up to ***over nineteen*** times CDC's risk of overdose level); *id.* at 6-7 (explaining for Patient F.L., Dr. Bockoff prescribed a Scheduled II opioid for a daily dose of 660 to 900 MMM—up to ***eighteen*** times CDC's risk of overdose level); *id.* at 7-8 (explaining for Patient A.W., Dr. Bockoff prescribed a Scheduled II opioid for a daily dose at a daily dose of 1,320 MME—up to ***over twenty-six*** times CDC's risk of overdose level).

Additionally, the ISO highlighted that Dr. Bockoff's "documentation in patient

5

records was poor and often illegible," adding that such records "were either blank, or provided minimal information," and were scattered in several locations, "including a garage storage facility." *Id.* at 8.

As a result, the ISO concluded that because of Dr. Bockoff's "significant history of unlawful prescribing," any further prescribing of controlled substances by Dr. Bockoff posed an imminent danger under 21 U.S.C. § 824(d). *Id.* The DEA also sought to revoke Dr. Bockoff's registration and to deny any future applications for renewal or modification of his registration because his continued registration is inconsistent with the public interest under 21 U.S.C. § 823(f). *Id.*

On November 1, 2022, the DEA hand-served the ISO to Dr. Bockoff personally. Morrell Decl. ¶ 4, **Ex. B**.

### C.    Dr. Bockoff's Expedient Pursuit of Administrative Remedies.

Just days after receiving the ISO, Dr. Bockoff began actively pursuing the administrative remedies afforded by the DEA—in marked contrast to his belated pursuit of the instant TRO proceeding, six weeks later. On November 4, 2022, Dr. Bockoff's counsel requested "a hearing in the matter of the October 25 immediate suspension of Dr. David Bockoff's [DEA] Certificate of Registration." *Id.* ¶ 5, **Ex. C**.

On November 8, 2022, an Order for Prehearing Statements was issued, allowing the parties to submit Prehearing Statements, including (1) a statement of the issues, (2) statement of the relief requested, (3) proposed stipulations and admissions of fact, (4) all proposed witnesses and brief summaries of their testimony, (5) a list of all documentary evidence to be offered into evidence, and (6) time estimates for case presentation. *Id.* ¶ 6, **Ex. D**. The Order further set a Prehearing Conference for November 29, 2022. *Id.*

On November 16, 2022, the DEA filed its Prehearing Statement, which identified five proposed witnesses, provided a detailed summary of their testimony, provided seventeen proposed stipulations fact, and listed twenty-eight proposed exhibits. *Id.* ¶ 7, **Ex. E**. The DEA estimated two days to present its case in chief. *Id.* Seven days later, Dr. Bockoff filed his Prehearing Statement, which identified eight proposed witnesses,

6

including himself and six patients, provided a detailed summary of their testimony, agreed to twelve of the DEA's seventeen proposed stipulations of fact, and listed three proposed exhibits. *Id.* ¶ 8, **Ex. F**. Dr. Bockoff estimated three days to present his defense. *Id.*

On November 29, 2022, a Prehearing Conference was held, with counsel for the DEA and Dr. Bockoff present. *Id.* ¶ 9, **Ex. G**. The next day, a Prehearing Ruling was issued, deeming as established the twelve stipulated facts, permitting the parties to submit supplemental prehearing statements by December 21, 2022, file motions by December 29, 2022 and responses thereto by January 6, 2023, and serve requests for subpoenas until December 21, 2022. *Id.*

On December 1, 2022, hearing dates for January 19-20, 2023, January 23-26, 2023, and February 6-8, 2023 were set. *Id.* ¶ 10, **Ex. H**. And a day later, the DEA delivered its exhibits to Dr. Bockoff. *Id.* ¶ 13.

### D.    Dr. Bockoff's Belated Pursuit of a TRO.

On December 15, 2022, with the hearing before the DEA less than five weeks away, Dr. Bockoff filed this action, seeking declaratory and injunctive relief. *See generally* Compl., Dkt. No. 2. The same day, Dr. Bockoff moved for a TRO to lift the ISO, which he had received six weeks ago. Dkt. No. 16.

### III.    ARGUMENT

As the party seeking the "extraordinary remedy" of a temporary restraining order, Dr. Bockoff must establish: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable injury absent an injunction; (3) the balance of equities tips in his favor; and (4) an injunction favors the public interest. *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 652 (9th Cir. 2020) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)); *Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995) (standard for issuing temporary restraining orders identical to issuing preliminary injunctions). When, as here, the government is a party, "these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

At the outset, Dr. Bockoff misstates the status quo, which is not his "continued authority to prescribe controlled substances." Dkt. No. 16, at 2. The DEA's October 25, 2022 ISO immediately suspended that authority because his prescribing practices posed an imminent danger. Dr. Bockoff's present state of suspension is thus the status quo, being in place for over six weeks. And because he seeks to *compel* Defendants to lift the ISO (as opposed to just prohibit their future action), he seeks mandatory relief against the government. Such mandatory relief is particularly disfavored and is not granted "unless extreme or very serious damage will result and are not issued in doubtful cases." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo" "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party").

## A.    Dr. Bockoff Does Not—*And Cannot*—Show Irreparable Harm.

The mere possibility of irreparable harm is not enough to warrant the "extraordinary remedy" of emergency injunctive relief. *See Winter*, 555 U.S. at 22. Instead, Dr. Bockoff must make a "clear showing" of irreparable harm. *Id.* He makes no such showing.

***Dr. Bockoff Has an Adequate Remedy.*** Tellingly, Dr. Bockoff makes virtually no mention of the crucial fact that—just three days after receiving the ISO—he actively pursued the DEA's administrative remedies to challenge the ISO. This new proceeding, by contrast, evidences a belated "try everything" approach. On November 4, 2022, Dr. Bockoff's counsel requested "a hearing in the matter of the October 25 immediate suspension of Dr. David Bockoff's [DEA] Certificate of Registration." Morrell Decl. ¶ 5, **Ex. C**. Just four days later, the DEA Office of Administrative Hearing allowed Dr. Bockoff to submit a prehearing statement, including proposed witness testimony, and set a Prehearing Conference for November 29, 2022. *Id.* ¶ 6, **Ex. D**.

On November 16, 2022—just two weeks after receiving the ISO—Dr. Bockoff received the DEA's Prehearing Statement, which identified five proposed witnesses,

8

provided a detailed summary of each witness' testimony, and listed twenty-eight proposed exhibits.  *Id.* ¶ 7, **Ex. E**.  Seven days later, Dr. Bockoff filed his own Prehearing Statement, which identified eight proposed witnesses, including himself and six patients, provided a detailed summary of their testimony, and listed three proposed exhibits.  *Id.* ¶ 8, **Ex. F**.  Less than two weeks later, Dr. Bockoff's counsel and the DEA participated in a Prehearing Conference.  *Id.* ¶ 9, **Ex. G**.  Subsequently, Dr. Bockoff and the DEA were permitted to file supplemental prehearing statements by December 21, 2022, file motions by December 29, 2022 and responses thereto by January 6, 2023, and serve requests for subpoenas until December 21, 2022.  *Id.*  On December 1, 2022, hearing dates were set for January 19-20, 2023, January 23-26, 2023, and February 6-8, 2023.  *Id.* ¶ 10, **Ex. H**.  And a day later, the DEA delivered its documentary evidence to Dr. Bockoff's counsel.  *Id.* ¶ 13.  These facts alone should spell denial for Dr. Bockoff's TRO.

As Courts in and outside of this District hold, "where there is an adequate remedy of law, there is no irreparable harm." *Zhenhua Logistics (H.K.) Co. v. Metamining, Inc.*, No. 13-cv-2658, 2013 WL 3360670, at *1 (N.D. Cal. July 3, 2013); *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013) (explaining that irreparable harm is "harm for which there is no adequate remedy at law"); *Robinson v. Alameda County*, 875 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012) ("Plaintiff has proffered no basis to request injunctive relief because an adequate remedy at law exists").

After having actively pursued this process through sophisticated counsel, Dr. Bockoff suddenly rushes into this Court, six weeks after receiving the ISO.  The Ninth Circuit has repeatedly held that such delay demonstrates the opposite of irreparable harm. *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights.  By sleeping on his rights, a plaintiff demonstrates the lack of need for speedy action"); *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Garcia v. Google, Inc.*, 786

F.3d 733, 746 (9th Cir. 2015) (affirming denial of preliminary injunction where the plaintiff "waited months to seek an injunction" because "this delay undercut [her] claim of irreparable harm").

**_Neither Dr. Bockoff's Asserted Financial Harms Nor Alleged Harms to Third Parties Are Irreparable Harms._**  Dr. Bockoff attempts to demonstrate irreparable harm by alleging in conclusory fashion—*with no evidence showing the extent of the putative injury relative to his actual finances and resources*—that the ISO has "already caused significant economic damage to Dr. Bockoff's medical practice" (Compl. ¶ 25) and that absent grant of the TRO he "will have to close his practice indefinitely in the next few weeks." Bockoff Decl. ¶ 8.  Courts in this District routinely reject such naked boilerplate assertions. *See, e.g.*, *Keywords, LLC v. Internet Shopping Enters.*, No. 5-cv-2488, 2005 WL 8156440, at *15 (C.D. Cal. June 29, 2005) ("in the absence of any evidentiary support, [plaintiff's] conclusory assertion that defendants' conduct will drive it out of business does not adequately establish irreparable injury").  Such assertions run headlong into longstanding Ninth Circuit precedent holding that "strictly monetary" injuries are generally not a basis for an injunction. *American Tunaboat Ass'n. v. Brown*, 67 F.3d 1404, 1411 (9th Cir. 1995); *Lydo Enters., Inc.*, 745 F.2d at 1213 ("Purely monetary injuries are not normally considered irreparable"); *Los Angeles Memorial Coliseum Comm'n. v. National Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("It is well established, however, that such monetary injury is not normally considered irreparable").

Dr. Bockoff provides no evidence that he cannot actually continue to maintain his business or else resume it, should the administrative proceedings resolve in his favor.  And for a doctor who has (by his own assertion) practiced for decades, such financial incapacity seems unlikely.  His declaration's suggestion that he might later choose to shut his medical business down does nothing to show that he will inevitably suffer irreparable harm, but rather indicates that he might *decide* not to finance such business continuation.

Nor can Dr. Bockoff fill this evidentiary void by pointing to patient harm, which as the ISO shows is harm that *he* himself helped cause.  *See Immigrant Legal Res. Ctr. v.*

*City of McFarland*, 827 F. App'x 749, 751 (9th Cir. 2020) ("the district court focused its irreparable harm analysis on the prospect of harm to third parties. The standard for preliminary injunctions, however, requires irreparable harm to the plaintiffs themselves"); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) ("Plaintiffs seeking injunctive relief must show that they themselves are likely to suffer irreparable harm"); *Senior Care Pharmacy Servs. v. Express Scripts, Inc.*, No. 21-cv-97, 2021 U.S. Dist. LEXIS 14433, at *11 (C.D. Cal. Jan. 25, 2021) ("the relevant irreparable harm inquiry is whether [plaintiff] has been harmed, not third parties").

Moreover, were Dr. Bockoff concerned about urgent medical risk to his patients (who came from all across the country) from (a) the time of the ISO's issuance until (b) the time they could find another pain specialist physician, he presumably would have immediately moved for a TRO to effectively facilitate their transition—and would present evidence of his efforts to facilitate it.  Similarly, while opiate withdrawal can be difficult, opiate withdrawal symptoms can be treated pursuant to many available programs.  Dr. Bockoff's license to provide patients with medical care and referrals (including opiate withdrawal programs) was not suspended by the ISO; only his DEA registration to prescribe patients with scheduled controlled substances was suspended.  Dr. Bockoff is not the only pain management doctor in the United States.  Yet he immediately pursued the administrative process, while only belatedly seeking a TRO in this Court, six weeks later.  And while Dr. Bockoff cites to the tragic post-ISO deaths of one of his patients and their spouse by suicide, he does not address the broader history of long-term opiate over-prescription exacerbating the risk of patient suicide and many other severe harms.  Because Dr. Bockoff cannot show irreparable harm, the Court can deny his TRO on this basis alone. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (*Winter* "requires the plaintiff to make a showing on all four prongs").

**B.    Dr. Bockoff is Not Likely to Succeed on the Merits.**

Courts reviewing the DEA's determination that a registrant constitutes an "imminent danger" apply the Administrative Procedures Act's arbitrary and capricious

standard. *See, e.g.*, *Evergreen Pharmacy, Inc. v. Garland*, No. 22-cv-3912, 2022 WL 3294842, at *5 (N.D. Ill. Aug. 11, 2022); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 214 (D.D.C. 2012). To demonstrate that the ISO was arbitrary and capricious, Dr. Bockoff must show that the DEA "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1257 (9th Cir. 2017). Dr. Bockoff makes no such showing. Instead, he erroneously alleges that the ISO's finding of imminent danger "was based solely on deficiencies in the medical records." Compl. ¶ 3. Dr. Bockoff is mistaken.

As detailed in the DEA's ISO, an independent expert's review of Dr. Bockoff's records from January 2020 to June 2022 found that he routinely dispensed Schedule II opioids—the most dangerous drugs—in significant dosages ***without*** conducting an appropriate evaluation, ***without*** appropriately establishing a medical justification, ***without*** proper medical records, ***without*** establishing appropriate medical necessity, and ***without*** conducting proper ongoing monitoring of his patients. Morrell Decl. ¶ 3, **Ex. A**, at 4-8. Dr. Bockoff baselessly and incorrectly claims that the DEA does "not allege any harm to [his] patients," while alleging "[n]o evidence or explanation, of facts and circumstances in the more than a year period, is specified as support for the finding of an imminent danger." Compl. ¶¶ 21, 24. To the contrary, the ISO provides extensive alarming detail on just how dangerous Dr. Bockoff's prescribing practices are:

- For Patient B.B., on a monthly basis, Dr. Bockoff prescribed morphine, oxycodone, and methadone—Schedule II opioids "common for diversion and abuse" at a daily dose of 225-720 MME—up to ***<u>over fourteen times</u>*** CDC's risk of overdose level. Morrell Decl. ¶ 3, **Ex. A** at 4. And Dr. Bockoff did so "with no evidence of improvement in pain and function." *Id.*

- For Patient E.C., on a monthly basis, Dr. Bockoff prescribed fentanyl, meperidine, and methadone—Schedule II opioids "common for diversion and

12

abuse"—at a daily dose of between 598 to 918 MME—up to ***over eighteen times*** CDC's risk of overdose level.  *Id.* at 5.  And, again, Dr. Bockoff did so "with no evidence of improvement in pain and function," while also prescribing fentanyl inconsistent with its FDA approved usage, putting Patient E.C. at even greater risk for addiction, overdose, and death.  *Id.*

- For Patient P.J., on a monthly basis, Dr. Bockoff prescribed oxycodone and methadone—Schedule II opioids "common for diversion and abuse"—at a daily dose of 780 to 960 MME—up to ***over nineteen times*** CDC's risk of overdose level.  *Id.* at 5-6.  Again, Dr. Bockoff did so "with no evidence of improvement in pain and function," while also prescribing a benzodiazepine in disregard of CDC guidance to "avoid prescribing opioid pain medication and benzodiazepines concurrently whenever possible."  *Id.*

- For Patient F.L., on a monthly basis, Dr. Bockoff prescribed oxymorphone (a Schedule II opioid) at a daily dose of 660 to 900 MME —up to ***eighteen times*** CDC's risk of overdose level.  *Id.* at 6-7.  And, again, Dr. Bockoff did so "with no evidence of improvement in pain and function," while also prescribing carisoprodol (a Schedule III muscle relaxer) and ketamine (a Schedule IV sedative), despite Patient F.L.'s asthma and his existing prescription for stimulants, exposing Patient F.L. to even greater risk for abuse and harm.  *Id.*

- For Patient A.W., on a monthly basis, Dr. Bockoff prescribed oxycodone—a Schedule II opioid "common for diversion and abuse"—at a daily dose of 1,320 MME —up to ***over twenty-six times*** CDC's risk of overdose level.  *Id.* at 7-8.  And, again, Dr. Bockoff did so "with no evidence of improvement in pain and function."  *Id.*

The above are just *examples* of Dr. Bockoff's prescribing practices, each of which "violated minimal medical standards applicable to the practice of medicine in the State of California."  *Id.*  at 8.

As a result of Dr. Bockoff's "significant history of unlawful prescribing" DEA

13

rightfully concluded he poses an "imminent danger" under 21 U.S.C. § 824(d). *Id.* Nor can Dr. Bockoff gainsay that such findings demonstrate "a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an immediate suspension of the registration." 21 U.S.C. § 824(d). *See Evergreen*, 2022 WL 3294842, at *10 ("the DEA's review of Patient 1, 2, and 3's files demonstrated that Evergreen had dispensed large quantities of controlled substances in dangerous combinations over the course of fourteen months" supported finding of imminent danger). The ISO's conclusion of imminent danger, supported by over three years' worth of Dr. Bockoff's records, clearly demonstrates a "rational connection between facts found and conclusions made." *Friends of the Santa Clara River v. United States Army Corps of Eng'rs*, 887 F.3d 906, 920-21 (9th Cir. 2018).

At bottom, Dr. Bockoff's bare assertions inch nowhere close to overcoming the "highly deferential" arbitrary and capricious APA standard, nor the DEA's entitlement "to a presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Here, too, the Court can deny Dr. Bockoff's TRO on this basis alone. *Alliance*, 632 F.3d at 1135.

## C. The Balance of Equities Do Not Tip in Dr. Bockoff's Favor, And A Mandatory Injunction Disserves the Public Interest.

In enacting the CSA, Congress found that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2). The CSA expressly authorizes the DEA to immediately revoke or suspend a DEA registration based on a finding of "imminent danger to the public health and safety." *Id.* §§ 824(a)(4), 824(d)(1). The DEA indisputably vindicated these public interests in immediately suspending Dr. Bockoff's registration in light of his habitual prescribing of dangerous opioids at alarmingly high dosages. The public interest at stake decidedly weighs against granting Dr. Bockoff's TRO.

Over and again, courts have recognized that "the government has a strong interest

in enforcing the CSA and ensuring that pharmaceutical drugs are not improperly diverted while the administrative proceedings before the DEA are pending." *Cardinal Health*, 846 F. Supp. 2d at 230; *Keysource Med., Inc. v. Holder*, No. 11-cv-393, 2011 WL 3608097, at *9 (S.D. Ohio Aug. 16, 2011) ("Although KMI has a private financial interest . . . it is plainly outweighed by the compelling public interest in preventing the distribution of controlled substances without adequate controls against diversion"); *Medipharm-Rx, Inc. v. Gonzales*, No. 6-cv-2223, 2006 WL 3842205, at *3 (M.D. Fla. Dec. 8, 2006) ("The public's interest in the proper enforcement of federal laws governing controlled substances outweighs Plaintiffs' interest in retaining their Certificates of Registration during the short interim until the hearing scheduled for January 8, 2007"). The public interest at stake is even more acute here.

For the last two decades, the scourge of opioid abuse and addiction has devastated the United States, the roots of which can be traced largely to the over-prescription of highly addictive opioid medications. *Purdue Pharma*, 635 B.R. at 35.[4] Against that backdrop, Dr. Bockoff prescribed Schedule II opioids in extraordinarily high dosages, and even now he still offers no evidence justifying or even explaining his practices. Instead of directly addressing the ISO's charges, Dr. Bockoff treats the ISO as if it were merely critiquing his *records*, and in response presents self-serving "aspirational improvements" to take better patients notes, signifying an utter failure to appreciate the seriousness of the ISO. And while it would be regrettable that Dr. Bockoff's patients may face hardships because of his unsafe practices contributing to their opioid dependency and addiction, California's Department of Health offers robust Narcotic Treatment Programs ("NPTs"), including fifty-three NPTs in L.A. County alone, providing opioid medication assisted treatment,

---

[4] Almost a third of patients who are prescribed opioids for chronic pain misuse them. *Id.* From 2019 to 2020, the number of drug overdose deaths increased by nearly 30% from and has quintupled since 1999. *Understanding the Opioid Overdose Epidemic*, CDC, https://www.cdc.gov/opioids/basics/epidemic.html. Nearly 75% of the 91,799 drug overdose deaths in 2020 involved an opioid. *Id.* From 2019 to 2020, opioid-involved death rates increased by 38%, while prescription opioid-involved death rates increased by 17%. L.A. County has historically had a prescription opioid and misuse higher than the national average. *Opioid Abuse Prevention and Treatment in Los Angeles County*, DHCS, http://publichealth.lacounty.gov/sapc/MDU/DE/OpioidBriefFactSheet.pdf.

including detoxification, maintenance treatment services, medical evaluations, and rehabilitative services. *See* Narcotic Treatment Programs, DHCS, https://www.dhcs.ca.gov/individuals/Pages/NTP.aspx.

Finally, the public interest is not served by issuing mandatory injunctive relief against the government on the theory that one unique doctor in the United States is willing to deviate from other doctors by prescribing unusually enormous opiate dosages for specific conditions not normally thought to require such measures—leaving his patients from across the country with no other option to get such enormous dosages except by immediately lifting the ISO. If Dr. Bockoff is actually the only doctor in the United States—which to repeat, remains at the top of the world in its per-capita opiate prescription rates—who will prescribe these extraordinarily high levels of opiates for these patients, then his status as an exception from prevailing medical norms underscores why the public interest is not served by immediately lifting the ISO.

Accordingly, Dr. Bockoff has not—*and cannot*—meet his burden to show that an injunction supports the public interest or that his purported hardships warrant a TRO.

## IV.   CONCLUSION

The Court should deny Dr. Bockoff's request for a temporary restraining order.

Dated:  December 19, 2022                    Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section

 /s/ *Zakariya K. Varshovi*
ZAKARIYA K. VARSHOVI
Assistant United States Attorney

*Attorneys for Defendants Merrick Garland, Anne Milgram, United States Department of Justice, and the Drug Enforcement Administration*

16

## **LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants Merrick Garland, Anne Milgram, United States Department of Justice, and the Drug Enforcement Administration certifies that this brief contains 5,607 words, which complies with the word limit of L.R. 11-6.1.

Dated:  December 19, 2022

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section

 /s/ *Zakariya K. Varshovi*
ZAKARIYA K. VARSHOVI
Assistant United States Attorney

*Attorneys for Defendants Merrick Garland, Anne Milgram, United States Department of Justice, and the Drug Enforcement Administration*