# EXHIBIT E

**UNITED STATES DEPARTMENT OF JUSTICE**
**Drug Enforcement Administration**

| | |
|---|---|
| IN THE MATTER OF<br><br>DAVID BOCKOFF, M.D. | DOCKET NO. 23-5 |

## GOVERNMENT'S PREHEARING STATEMENT

Pursuant to the November 8, 2022 Order for Prehearing Statements, the United States Department of Justice, Drug Enforcement Administration (DEA or Government), hereby submits its Prehearing Statement regarding David Bockoff, M.D.  (Respondent or Dr. Bockoff).

### ISSUES

Whether, by a preponderance of the evidence, DEA should revoke DEA Certificate of Registration ("DEA-COR") No. BB4591839 issued to the Respondent, pursuant to 21 U.S.C. §§ 824(a)(4) and 823(f) and deny any pending applications for renewal or modification of such registration pursuant to 21 U.S.C §823(f).

### REQUESTED RELIEF

The Government requests a ruling by the Administrative Law Judge recommending that the Respondent's Certificate of Registration BB4591839 be revoked, and that any pending application for renewal or modification of such registration be denied.

## PROPOSED STIPULATIONS OF FACT[1]

1. Respondent is registered with DEA as a practitioner authorized to handle controlled substances in Schedules II-V under DEA COR number BB4591839 at 8500 Wilshire Blvd, Suite 926, Beverly Hills, CA 90211-3107.

2. DEA COR BB4591839 expires on July 31, 2025.

3. On September 14, 2022, DEA executed a search and seizure warrant on Dr. Bockoff's home and office.

4. Patient B.B is a patient of Dr. Bockoff.  Between January 2020 and June 2022, Dr. Bockoff prescribed morphine sulfate 100mg, oxycodone 30mg, and methadone 10mg.

5. Patient E.C. is a patient of Dr. Bockoff.  Between January 2020 and June 2022, Dr. Bockoff prescribed fentanyl in various dosage amounts, methadone 10mg, and meperidine 50mg.

6. Patient P.J. is a patient of Dr. Bockoff.  Between January 2020 and June 2022, Dr. Bockoff prescribed oxycodone 30mg, methadone 10mg, and alprazolam 2mg.

7. Patient F.L. is a patient of Dr. Bockoff.  Between January 2020 and June 2022, Dr. Bockoff prescribed oxymorphone in various dosage amounts, ketamine 5.75mg, and carisoprodol 350mg.

8. Patient A.W. is a patient of Dr. Bockoff.  Between January 2020 and June 2022, Dr. Bockoff prescribed oxycodone 30mg and 80mg.

9. Oxycodone is a Schedule II opioid.

10. Methadone is a Schedule II opioid.

11. Fentanyl is a Schedule II opioid.

12. Meperidine is a Schedule II opioid.

---

[1] The Government anticipates discussing additional stipulations with Respondent.

13. Morphine Sulfate is a Schedule II opioid.

14. Oxymorphone is a Schedule II opioid.

15. Ketamine is a Schedule III sedative

16. Carisoprodol is a Schedule IV muscle relaxant.

17. Alprazolam is a Schedule IV benzodiazepine.

## PROPOSED WITNESSES

1. DEA Diversion Investigator (DI) Stephanie Woolley 1340 W 6th Street, Los Angeles, CA 90017

2. DEA Special Agent (SA) Antoine Salfity, 200 S. Civic Drive, Palm Springs, CA 92262

3. DI Desiree Johnson 1340 W 6th Street, Los Angeles, CA 90017

4. DI Isaac Quintero 255 E Temple Street 17th Floor, Los Angeles, CA 90012

5. Subject Matter Expert Dr. Timothy Munzing, 2521 Michelle Dr, Tustin, CA 92780

## SUMMARY OF TESTIMONY

1. **DI Stephanie Woolley.**  After testifying about her education and experience, DI Woolley will identify and authenticate the various Government Exhibits, including the patient records, prescriptions and other DEA registration records.

DI Woolley will testify about the beginning phases of the investigation relating to the Respondent.  She will testify that she, and other investigators and agents received information from other law enforcement agencies about Respondent.  DI Woolley will further testify that based on that information, she requested information from California's Prescription Drug Monitoring Program (CURES).[2]  She will testify that after receiving the CURES data from October 2016- October 2019 she analyzed the data for any prescribing patterns or trends.  She

---

[2] CURES is the Controlled Substance Utilization Review and Evaluation System.

3

will testify that what stood out to her was the high number of prescriptions issued by Respondent for high dosage amounts of controlled substances and his pattern of prescribing multiple combinations of controlled substances. DI Woolley will testify that she provided the CURES data to a subject matter expert, Dr. Timothy Munzing M.D. Based on the review by the expert, a search warrant was obtained for medical records and other documentation. DI Woolley will testify that on September 14, 2021, the search warrant was served on both Respondent's medical practice, home, and Midwest Pharmacy. In addition, she will testify that a consent search was conducted on Dr. Bockoff's storage facility. She will testify that once obtained, 30 patient records were provided to the subject matter expert for review.

DI Woolley will testify that the patient files were brought to the DEA offices and stored at that location. She will further testify that the patient files were scanned to create a digital copy. Moreover, she will attest to conducting a quality control check on the records to ensure they were scanned correctly.

Diversion Investigator Woolley will testify that she obtained prescriptions via subpoena from various pharmacies. She will testify that she scanned the prescriptions and subsequently arranged them in chronological order.

DI Woolley was present during the service of the ISO and will testify that it was served at Respondent's medical office on November 1, 2022.

DI Woolley will testify that while serving the ISO, she had the opportunity to observe the practice and "exam" rooms. She will testify that from her recollection, there are several rooms in the practice, and she only saw one exam table, that was covered in documents and did not appear to be used to perform patient exams.

DI Woolley will further testify that after the service of the ISO, she served an administrative subpoena for patient records on the Respondent via his attorney.

2. **DEA Special Agent Antone Salfity.** After testifying about his education and experience, serving as Special Agent Salfity and the origins of his investigation in this case. SA Salfity can testify about the same occurrences as DI Woolley. SA Salfity will also testify that he was present at Respondent's medical practice on the day of the search warrant. SA Salfity will testify that he observed the practice and exam rooms while on scene during the search warrant. He will testify that the exam table was covered in paperwork. SA Salfity will testify that during his observations of the practice, he noticed that Respondent arrives at the office between 11 a.m. and 12 p.m., while patients are present as early as 9 a.m. He will further testify that he has seen patients waiting in the parking garage near Respondent's parking space.

3. **DI Desiree Johnson**. After testifying about her education and experience, DI Johnson will identify and authenticate the various Government Exhibits, including the patient records. DI Johnson will testify that she was present at the time that the search warrant was executed and that she oversaw the search and recovery of the patient records entered into evidence. She will testify that once obtained, the records were kept at DEA headquarters before being scanned to create a digital copy.

4. **DI Isaac Quintero.** After testifying about her education and experience, DI Quintero will identify and authenticate prescriptions received pursuant to a search and seizure warrant of Midwest Pharmacy for prescriptions for Patient P.J.

5. **Dr. Timothy Munzing.** After testifying about his education and experience, Dr. Munzing will be qualified and testify as an expert on the practice of medicine in California, including, but not limited to the applicable standards of care in California for the prescribing of

controlled substances within the usual course of professional practice of medicine. Dr. Munzing will testify that he is familiar with applicable federal and state laws pertinent to this case.

Dr. Munzing will testify that he was retained by DI Woolley and SA Salfity to review the patient records for several patients of Dr. Bockoff. Dr. Munzing will testify that initially he reviewed CURES data from January 2017 to January 2020. He will testify that he noticed a high number of prescriptions being written and several million dosage units for mainly opioids. He will further testify that he noticed that Dr. Bockoff was prescribing a high amount of oxycodone and of the oxycodone prescribed the majority was 30 mg dosing. Dr. Munzing will testify that oxycodone 30mg is the highest dosage for short-acting oxycodone. Dr. Munzing will finally testify that oxycodone 30mg is a drug that is frequently diverted.

Next, Dr. Munzing will testify that he received patient records retrieved during a search warrant executed at Dr. Bockoff's practice. Dr. Munzing will testify that he reviewed the patient files and formulated an opinion.

Dr. Munzing will testify as to standard of care in California pertaining to the prescribing of opioids. Dr. Munzing will testify that in addition to the Medical Board of California, several national organizations have developed guidelines for prescribing opioids and other controlled substances. He will explain that the standard of care for practicing medicine includes (1) a comprehensive initial assessment to arrive at one or more likely diagnoses, (2) providing holistic treatment plans individualized to the likely diagnosis, (3) careful patient monitoring, and (4) comprehensive documentation. Dr. Munzing will further testify that when managing a patient on controlled substances a doctor must do the following: perform an appropriate evaluation, develop a differential diagnosis, assess the risk to the patient, develop a management plan, monitor the patient and mitigate the risk whenever possible.

Dr. Munzing will testify that an appropriate evaluation should include, among other things, receiving a medical history, conducting a physical exam, inquiring about chronic medical problems, and assessing the patient's pain.  He will testify that a physician should use the information gained during the evaluation to determine the risk of controlled substances to the patient's health and the potential risk of drug abuse, misuse, overdose or death.  Dr. Munzing will testify that ways to monitor a patient should include, receiving an updated history, continuing to conduct physical exams, inquiring about adverse effects to the medication, continuing to conduct urine drug screenings, and reviewing the patient's CURES data.   Lastly, mitigating the patient's risk can include medication tapering, elimination, or safer strategies and treatments.

Dr. Munzing will testify about the importance of urine drug testing/screening (UDT/S).  He will testify that UDT/S is a tool used while conducting an appropriate medical evaluation.  Dr. Munzing will testify that periodic UDT/S can be used to confirm that the medications prescribed are being used, improve patient compliance and determine what if any other substances are being used.  Dr. Munzing will testify that UDT/S can be a useful tool at the initial point of care as well as throughout the life of treatment.  He will further testify that failure to perform UDT/S can provide the patient the opportunity to avoid compliance with the drug regimen and/or use other substances.  Dr. Munzing will testify that when inconsistencies are found after the test, the doctor must address the result with the patient and document the outcome of that inquiry.  Dr. Munzing will testify that the frequency of UDT/S is based on patient risk.  Several organizations address the frequency of UDT/S, and they all recommend that doctors use this tool.[3]  The frequency

---

[3] These organizations include, Centers for Disease Control (CDC), Agency Medical Directors Group, American Association of Pain Medicine, American Family Physician, Up-to-Date, Centers for Medicare and Medicaid Services (CMS).

depends on whether a patient is determined to be low, medium or high risk. Dr. Munzing will testify that the risk category is determined by several factors to include, age, drug combinations, frequency of medication and dosage amounts. He will testify that for high risk patients, the recommended frequency for UDT/S is every 3-4 months.

Dr. Munzing will testify that the Morphine Milligram Equivalency (MME) is a measurement tool used to compare opioids with varying strengths.[4] Dr. Munzing will testify that during the time Dr. Bockoff was prescribing the opioids to the patients noticed in the ISO/OTSC, the CDC notified practitioners that patients are at a high risk of harm when receiving opioids in excess of 90 MME per day. Dr. Munzing will testify that although the CDC Guidelines are a recommendation and not an absolute, the higher the MME, the greater risk for overdose and death. Dr. Munzing will testify that the standard of care mandates that when high dosages of opioids are prescribed, the medical records adequately acknowledge the high dosage and give a rationale. Dr. Munzing will discuss the tenet of risk v benefit analysis.

**Patient B.B.**

Dr. Munzing will testify that in his expert opinion, the prescriptions issued to Patient. B.B. (B.B.) were not medical justified and not in the usual course of professional practice. Dr. Munzing will testify that B.B. was receiving prescriptions from Dr. Bockoff for the following controlled substances: morphine sulfate 100 mg, oxycodone 30mg, and methadone 10mg. After a review of B.B. patient records, Dr. Munzing determined and will testify that Dr. Bockoff did not follow the standard of care before prescribing the abovementioned opioids. Dr. Bockoff did not conduct a proper medical evaluation, obtain informed consent, mitigate the risks of addiction and diversion, or monitor patient compliance. Dr. Munzing will also testify that the combination of

---

[4] References are CDC and CMS.

the opioids being prescribed was at a significantly elevated dose. Dr. Munzing will testify that B.B. was receiving controlled substances between 225 and 720 morphine milligram equivalent (MME). Dr. Munzing will testify that despite the high dosage, there was no evidence of improvement in the patient's pain. Dr. Munzing will further testify that Methadone is a long acting high risk opiate with significant risks, there is no evidence of why methadone is used as opposed to a different opiate.

Dr. Munzing will testify that despite there being Consent to Prescribe forms included in the medical file, that advisement is incomplete. Dr. Munzing will testify that the advisement is incomplete as it does not advise the patient of the increased possibility of overdose and death. For example, Dr. Munzing will testify that on many visits from which prescriptions for controlled substances resulted, Dr. Bockoff did not conduct proper medical evaluations. Dr Munzing will testify that on May 7, 2020, Dr. Bockoff did not take an appropriate patient history, did not conduct an appropriate physical exam, did not detail his assessment, provide a treatment plan, nor list the medication prescribed. Dr. Munzing will testify that a proper patient history includes details of the patient's present condition, which are not present in the patient file for May 7, 2020. Dr. Munzing will testify that on this visit there is an aberrant drug screening that was recorded. However, other than a post-it note, there is no indication that the aberrancy was addressed with the patient or resolved. In addition, Dr. Munzing will testify that based on guidelines, B.B. is not undergoing random drug screening as recommended. He will testify that based on his reading of the patient's file and CURES data, this patient is in the high-risk category and should be screened every 3-4 months. As a result of the visit on May 5, 2020, Dr. Bockoff prescribed controlled substances. Based on Dr. Munzing's assessment, those prescriptions were not for a legitimate medical purpose nor within the standard of care in California. Dr. Munzing

will further testify that these same inadequacies exist throughout the medical record on varying dates. Dr. Munzing will testify that there are several office visits where there are no notes recorded. [5]

**Patient E.C.**

Dr. Munzing will testify that in his expert opinion, the prescriptions issued to Patient. E.C. (E.C.) were not medical justified and not in the usual course of professional practice. Dr. Munzing will testify that E.C. was receiving prescriptions from Dr. Bockoff for the following controlled substances: fentanyl in various dosage amounts, methadone 10mg, and meperidine 50mg. After a review of E.C. patient records, Dr. Munzing determined and will testify that Dr. Bockoff did not follow the standard of care before prescribing the abovementioned opioids. Dr. Munzing will testify that Dr. Bockoff did not conduct a proper medical evaluation, obtain informed consent, mitigate the risks of addiction and diversion, or monitor patient compliance. Dr. Munzing will also testify that the combination of the opioids being prescribed was at a significantly elevated dose. Dr. Munzing will testify that E.C. was receiving controlled substances at between 598 and 918 MME. Dr. Munzing will testify that despite the high dosage, there was no evidence of improvement in the patient's pain. Further Dr. Munzing will testify that the approved usage for the type of fentanyl is for breakthrough cancer pain.[6] Dr. Munzing will testify that Dr. Bockoff continued E.C. previous fentanyl regimen; however, failed to document the reasons for the regimen, the reasons for its continued use or a risk evaluation for the controlled substance. Specifically, Dr. Munzing will testify that on many office visits E.C. had a pain level of 10. In Dr. Munzing's opinion, there is a risk-benefit analysis that must happen

---

[5] During the hearing, the Government will provide more examples of the same or similar deficiencies in the patient record for Patient B.B.
[6] Referenced FDA access data for Actiq Fentanyl Lozenges.

while prescribing high amounts of opioids. The doctor and patient must weigh the health risk of prescribing high amounts of opioids against the fact that there is no benefit; the pain is not lessening. Dr Munzing will testify, that similar to B.B, E.C. is in the high-risk category and should take 3-4 UDT/S per year. Similarly, Dr. Munzing will testify that aberrant tests were not addressed with the patient. Dr. Munzing will testify about the importance of informed consent, and although there is a Consent to Prescribe form, the form does not adequately address the risks of being prescribed high dose opioids.

Dr. Munzing will testify that on March 13, 2020, Dr Bockoff had a patient visit with patient E.C. Dr Munzing will testify that on March 13, 2020, Dr. Bockoff did not take an appropriate patient history, did not conduct a physical exam, did not detail his assessment, nor list the all medication prescribed. As a result of this office visit, Dr Bockoff prescribed several controlled substances. Dr. Munzing will testify that these prescriptions were not for a legitimate medical purpose or within the California standard of care.

Dr. Munzing will further testify that these same inadequacies exist throughout the medical record on varying dates. Dr. Munzing will testify that there are several office visits where there are no notes recorded, or notes appear to be identical.[7]

**Patient P.J.**

Dr. Munzing will testify that in his expert opinion, the prescriptions issued to Patient P.J. (P.J) were not medical justified and not in the usual course of professional practice. Dr. Munzing will testify that P.J. was receiving prescriptions from Dr. Bockoff for the following controlled substances: oxycodone 30mg, methadone 10mg and alprazolam 2mg. After a review of P.J.'s patient records, Dr. Munzing determined and will testify that Dr. Bockoff did not follow the

---

[7] During the hearing, the Government will provide more examples of the same or similar deficiencies in the patient record for Patient E.C.

11

standard of care before prescribing the abovementioned opioids and benzodiazepines. Dr. Munzing will testify that Dr. Bockoff did not conduct a proper medical evaluation, obtain informed consent, mitigate the risks of addiction and diversion, or monitor patient compliance. Dr. Munzing will also testify that the combination of the opioids and benzodiazepines being prescribed was at a significantly elevated dose. Dr. Munzing will testify that P.J was receiving controlled substances at between 780 and 960 MME. Dr. Munzing will testify that despite the high dosage, there was no evidence of improvement in the patient's pain.

Dr. Munzing will testify that Dr. Bockoff was prescribing a combination of opioids and benzodiazepines, despite the CDC and Food and Drug Administration (FDA) guidelines that say to use caution when prescribing the combination of controlled substances. Dr. Munzing will testify that prescribing this combination allows for a higher risk of respiratory depression. Dr. Munzing will testify that the risk of the combination of substances was not explained or addressed with the patient. Dr Munzing will also testify that the medical records do not document the reasoning for the prescribed combination and specific dosing. Dr. Munzing will testify that alprazolam 2mg is the highest dosage and a substance that is highly diverted.

Dr. Munzing will testify that the medical records do no document UDT/S. He will testify that P.J. is a high risk patient and should have 3-4 UDT/S per year.

Dr. Munzing will testify that on September 3, 2020, Dr Bockoff had a patient visit with patient P.J. Dr Munzing will testify that on September 3, 2020, Dr. Bockoff did not take an appropriate patient history, did not conduct a physical exam, did not detail his assessment, nor list the all medication prescribed. As a result of this office visit, Dr Bockoff prescribed several controlled substances. Dr. Munzing will testify that these prescriptions were not for a legitimate medical purpose or within the California standard of care.

Dr. Munzing will further testify that these same inadequacies exist throughout the medical record on varying dates. Dr. Munzing will testify that there are several office visits where there are no notes recorded, or notes appear to be identical.[8]

**Patient F.L.**

Dr. Munzing will testify that in his expert opinion, the prescriptions issued to Patient F.L. (F.L) were not medical justified and not in the usual course of professional practice. Dr. Munzing will testify that F.L. was receiving prescriptions from Dr. Bockoff for the following controlled substances: oxymorphone in various dosage amounts, ketamine 5.75mg, and carisoprodol 350mg. After a review of F.L.'s patient records, Dr. Munzing determined and will testify that Dr. Bockoff did not follow the standard of care before prescribing the abovementioned controlled substances. Dr. Munzing will testify that Dr. Bockoff did not conduct a proper medical evaluation, obtain informed consent, mitigate the risks of addiction and diversion, or monitor patient compliance.

Dr. Munzing will also testify that the combination of the opioids and being prescribed was at a significantly elevated dosage amount. Dr. Munzing will testify that F.L. was receiving controlled substances between 660 and 900 MME. Dr. Munzing will testify that despite the high dosage, there was no evidence of significant improvement in the patient's pain. In addition, Dr. Munzing will testify that Dr. Bockoff was prescribing controlled substances while F.L. was receiving amphetamine salts, a stimulant, from another doctor. F.L. suffered from asthma; the combinations of substances prescribed puts the patient at risk for harm.

---

[8] During the hearing, the Government will provide more examples of the same or similar deficiencies in the patient record for Patient P.J.

Dr. Munzing will testify that despite there being Consent to Prescribe forms included in the medical file, that advisement is incomplete. Dr. Munzing will testify that the advisement is incomplete as it does not advise the patient of the increased possibility of overdose and death concerning the combinations of substances. Further Dr. Munzing will testify that consent is a continuing process, it is not enough to advise a patient on one occasion of the risks of the treatment. Dr. Munzing will testify that other than the Consent to prescribe form, there is no documentation of continuing advisements to the patient.

Dr. Munzing will testify that on May 8, 2020, Dr. Bockoff had a patient visit with patient F.L. Dr Munzing will testify that on May 8, 2020, Dr. Bockoff did not take an appropriate patient history, did not conduct an appropriate physical exam, did not detail his assessment, nor list the all medication prescribed. Dr. Munzing will testify that there are no details about the "starvation diet" that is documented in the notes. As a result of this office visit, Dr. Bockoff prescribed several controlled substances. Dr. Munzing will testify that these prescriptions were not for a legitimate medical purpose or within the California standard of care.

Dr. Munzing will further testify that these same inadequacies exist throughout the medical record on varying dates. Dr. Munzing will testify that there are several office visits where there are no notes recorded, or notes appear to be identical.[9]

**Patient A.W.**

Dr. Munzing will testify that in his expert opinion, the prescriptions issued to Patient A.W. (A.W.) were not medical justified and not in the usual course of professional practice. Dr. Munzing will testify that A.W. was receiving prescriptions from Dr. Bockoff for the following

---

[9] During the hearing, the Government will provide more examples of the same or similar deficiencies in the patient record for Patient F.L.

controlled substances: oxycodone 30mg and 80mg. After a review of A.W.'s patient records, Dr. Munzing determined and will testify that Dr. Bockoff did not follow the standard of care before prescribing the abovementioned opioids. Dr. Munzing will testify that Dr. Bockoff did not conduct a proper medical evaluation, obtain informed consent, mitigate the risks of addiction and diversion, or monitor patient compliance.

Dr. Munzing will also testify that the combination of the opioids being prescribed was at a significantly elevated dose. Dr. Munzing will testify that A.W. was receiving controlled substances at 1320 or higher MME. Dr. Munzing will testify that despite the high dosage, there was no evidence of improvement in the patient's pain.

Dr. Munzing will testify that the medical records do not adequately report UDT/S. He will testify that A.W. is a high-risk patient and should have 3-4 UDT/S per year.

Dr. Munzing will testify that despite there being Consent to Prescribe forms included in the medical file, that advisement is incomplete. The form does not address the increased risk caused by A.W. mental health diagnoses. A.W.'s mental health, places him at higher risk for abuse, overdose and death while using the prescribed controlled substances.

Dr. Munzing will testify that on June 4, 2021, Dr. Bockoff had a patient visit with patient A.W. Dr Munzing will testify that on June 4, 2021, Dr. Bockoff did not take an appropriate patient history, did not conduct a physical exam, did not detail his assessment or plan, nor list the all medication prescribed. As a result of this office visit, Dr. Bockoff prescribed several controlled substances. Dr. Munzing will testify that these prescriptions were not for a legitimate medical purpose or within the California standard of care.

Dr. Munzing will further testify that these same inadequacies exist throughout the medical record on varying dates. Dr. Munzing will testify that there are several office visits where there are no notes recorded, or notes appear to be identical.[10]

**Patient Records**

Dr. Munzing will testify about the purpose of maintaining medical records for patients. He will testify that the purpose is in part to document the current medical condition of the patient. He will testify that the purpose is to create a record that can be relied upon at a later date and by other doctors. Dr. Munzing will testify that in order for medical records to be useful they must be legible and organized to allow for access by doctors and medical staff. Dr. Munzing will testify that he was informed that the records were found in many locations and boxes in the medical office. He will testify that there was no apparent organization which Dr. Bockoff could use if he needed to review all records for a specific patient for patient care.

In sum, Dr. Munzing will testify that Dr. Bockoff's patient care fell below the standard of care in California and the prescriptions resulting from several examinations were not for a legitimate medical purpose.

---

[10] During the hearing, the Government will provide more examples of the same or similar deficiencies in the patient record for Patient A.W.

# PROPOSED DOCUMENTS[11]

1. Respondent's DEA COR BB4591839 (2 pages)
2. Patient A.W.
   a. A.W. Patient File 1 (270 pages)
   b. A.W. Patient File 2 (132 pages)
   c. A.W. Prescriptions (20 pages)
   d. A.W. CURES Data (7 pages)
3. Patient B.B.
   a. B.B. Patient File 1 (591 pages)
   b. B.B. Patient File 2 (167 pages)
   c. B.B. Prescriptions (26 pages)
   d. B.B. CURES Data (7 pages)
4. Patient E.C.
   a. E.C. Patient File 1 (234 pages)
   b. E.C. Patient File 2 (806 pages)
   c. E.C. Patient File 3 (276 pages)
   d. E.C. Prescriptions (116 pages)
   e. E.C. CURES Data (7 pages)
5. Patient F.L
   a. F.L. Patient File 1 (274 pages)
   b. F.L. Patient File 2 (117 pages)
   c. F.L. Prescriptions (66 pages)
   d. F.L. CURES Data (7 pages)
6. Patient P.J.
   a. P.J. Patient File 1 (371 pages)
   b. P.J. Patient File 2 (492 pages)
   c. P.J. Patient File 3 (255 pages)
   d. P.J. Patient File 4 (539 pages)
   e. P.J. Prescriptions (71 pages)
   f. P.J Prescriptions Midwest Pharmacy Log (3 pages)
   g. P.J. Prescriptions Midwest Pharmacy (240 pages)
   h. P.J. CURES (7 pages)
7. Dr Timothy Munzing Curriculum Vitae (approximately 20 pages)[12]

---

[11] The Government served a subpoena for updated patient files on Respondent's Counsel. Once received, the Government will be seeking to update the proposed documents to include those additional files.

[12] The Government is waiting for an updated CV for Dr. Munzing and will amend the page count if appropriate.

8.       Search and Seizure Warrant

## OTHER MATTERS

The Government reserves the right to supplement its Prehearing Statement and offer supplemental documents in response to Respondent's Prehearing Statement and proposed documents or if additional information is received.

## DESIRED LOCATION AND BEST ESTIMATE AS TO TIME REQUIRED TO PRESENT CASE

The Government anticipates requiring two days to present its case in chief, exclusive of cross-examination and rebuttal. The Government desires that the hearing location remain as stated in the Order to Show Cause, DEA Hearing Facility, 700 Army Navy Drive, 2nd Floor, Arlington, VA 22202. The Government also desires that there be a hybrid option for those witnesses, who may not be able to travel.

Respectfully submitted,

*Vanea Morrell*

Dated: November 16, 2022             **Vanea A. Morrell**
Attorney
Diversion and Regulatory Litigation
Office of Chief Counsel
Drug Enforcement Administration
8701 Morrissette Drive
Springfield, Virginia 22152
Vanea.A.Morrell@dea.gov

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 16th day of November, 2022, a copy of the foregoing **GOVERNMENT'S PREHEARING STATEMENT** were sent *via* email to the DEA Office of Administrative Law Judges at ECF-DEA@usdoj.gov and *via* email to Respondent's counsel, Mark Bartlett, MarkBartlett@dwt.com

      *Vanea Morrell*
Vanea A. Morrell
Diversion & Regulatory Litigation
Office of Chief Counsel
Drug Enforcement Administration
8701 Morrissette Drive
Springfield, Virginia 22152
Vanea.A.Morrell@usdoj.gov