CHAPMAN LAW GROUP
Summer McKeivier SBN 230605
1441 Long Lake Rd., Ste. 310
Troy, MI 48098
Telephone (248) 644-6326
Fax (248) 644-6324
smckeivier@chapmanlawgroup.com

Attorneys for Plaintiff
Dr. David Bockoff

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| David Bockoff, MD, <br><br> Plaintiff, <br> vs. <br><br> **MERRICK GARLAND**, Attorney General of the United States, United States Department of Justice; **ANNE MILGRAM**, Administrator Drug Enforcement Administration, United States Department of Justice: **UNITED STATES DEPARTMENT OF JUSTICE**; and **DRUG ENFORCEMENT ADMINISTRATION**, United States Department of Justice, <br><br> Defendants. | Case No.: 2:22-cv-9046 <br><br> **PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

# TABLE OF AUTHORITIES

**Cases** **Page**

*Bates Drug Stores, Inc. v. Holder,* 2011 U.S. Dist. LEXIS 52404, at *6 (E.D. Wash. May 6, 2011) .................................................................................................................. 6,8

*Garcia v. Google, Inc.,* 786 F.3d 733 (9th Cir. 2015) ................................................... 5

*Keywords, LLC v. Internet Shopping Enters.*, No. 5-cv-2488, 2005 WL 8156440, at *15 (C.D. Cal. June 29, 2005) ................................................................................ 5

*Lydo Enters. v. Las Vegas*, 745 F.2d 1211 (9th Cir. 1984) ..................................... 3,4,6

*Los Angeles Memorial Coliseum Com. v. National Football League,* 634 F.2d 1197 (9th Cir. 1980) ............................................................................................................... 6

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 71 F.3d 873, 879 (9th Cir. 2009) ................................................................................................................. 3

*Pom Wonderful LLC v. Pur Bevs. LLC,* 2015 U.S. Dist. LEXIS 176834 (C.D. Cal. 2015) .... 8,13

*Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir. 1963) ................. 4

*Oak Hill Hometown Pharm. v. Dhillon,* 418 F. Supp. 3d 124 (S. D. W. Va. 2019) ..... 13

**Statutes**

21 U.S.C. § 812(b) ........................................................................................................ 2

21 U.S. Code § 824(d) .................................................................................................. 2

I.      **Information**

On November 1, 2022, the Drug Enforcement Administration (DEA) served an Order to Show Cause and Immediate Suspension Registration (ISO) on Dr. David Bockoff at his pain management clinic. The ISO alleged that immediate suspension was warranted because his continued prescribing constituted "an imminent danger to the public health or safety." The immediacy of this danger to the public was based on the DEA's subject matter expert's opinion of the medical records of five patients, seized from the clinic during the execution of a search warrant on September 14, 2021, over a year prior to the ISO. Yet in the first two sentences, and throughout, the Defendants' Opposition to Dr. Bockoff's application for a temporary restraining order (TRO) against the ISO, it repeatedly, and ironically, scoffs at Dr. Bockoff's six-week delay in seeking the relief requested. (Dkt. 20 at 5)

The opposition continues by asserting that due to this delay and the Defendants' professed alternative adequate remedy at law, the administrative OSC hearing, Dr. Bockoff cannot show irreparable harm. Compounding its argument against irreparable harm, Defendants accuse the plaintiff of not "adequately financ[ing] his own business" during the pendency of those proceedings. (*Id.* at 2) Then concludes by minimizing any hardship suffered, including patient deaths, by the immediate suspension of Dr. Bockoff's DEA registration in comparison to the Government's strong interest in "ensuring that controlled substances are not improperly diverted." (*Id.* at 6) However, while heralding this important Government interest, it again fails to provide any evidence that controlled substances prescribed by Dr. Bockoff *were ever diverted*, continuing only to quote from its subject matter expert's inaccurate opinion.

Further, in its condemnation of Dr. Bockoff's business acumen, Defendants neglect to consider the over one million dollars it seized and continues to withhold from him and his medical practice. During the search warrant execution at his residence the DEA seized and initiated administrative forfeiture procedures on over $100,000 in U.S. and European Union (euro) currency. **(See Exhibit A,**

**DEA Administrative Notice)** Subsequently, Dr. Bockoff also received notice from Wells Fargo bank that over $900,000 had been seized from his clinics account. **(See Exhibit B, Wells Fargo Notice of Legal Order Withdrawing All Funds)**

## II.     Argument

While Defendants' Opposition correctly cites *some* of the relevant statutory authority, its glaring omissions are most telling.

Title 21, United States Code, section 812(b), provides the findings required in determining the appropriate schedule for controlled substances. While Schedule I drugs, are those with a "high potential for abuse" and no "currently accepted medical use in treatment," those in Schedule II, although omitted by the Defendants', are currently accepted for medical use in treatment. However, § 812 does not qualify Schedule IIs as "the most dangerous drugs that may dispensed," as the opposition misleads. It is for their accepted medical use that Dr. Bockoff prescribed them to his pain patients, not for their abuse or dependency *"potential."* If the DEA intends to focus only on § 812(b)(2) subsections (A) and (B) and continue irreparably harming the doctors who prescribe and the patients who require opiate medications, then it should consider reclassifying them, rather than ignoring their medical use.

Admittedly, Schedule II controlled substances do have the *"potential"* for abuse and dependency, however, "imminent danger to the public health and safety" requires "a substantial likelihood" to support the immediate suspension. 21 U.S.C. § 824(d)(2) It is this requirement for which the DEA still has provided no evidence to justify the ISO of Dr. Bockoff's registration. And, why plaintiff is seeking dissolution by this "court of competent jurisdiction." *Id.* (d)(1)

Without citing to any case law or authority, Defendants claim that Dr. Bockoff has misstated the status quo. (Dkt. 20 at 12) Instead, it simply declares that Dr. Bockoff's "present state of suspension is [] the status quo, being in place for over six weeks." *Id.* Never mind the fact that Dr. Bockoff has maintained a valid DEA registration for over fifty (50) years without incident prior to the immediate

suspension, but even a case cited later in the opposition directly undermines its contention. That is, in *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, the Ninth Circuit held that the status quo is "the last, uncontested status which preceded the pending controversy.". 571 F.3d 873, 879 (9th Cir. 2009); *see also Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir. 1963) (holding the status quo was the operation of an extensive business, over the course of <u>many</u> years, from which the parties realized profits). Undeniably, Dr. Bockoff maintained a valid DEA registration prior to the controversy in this case, the immediate suspension of the same, and thus, the status quo is his continued authority to prescribe controlled substances under that registration.

The remainder of the Opposition's arguments, addressed, in turn, below, suffer a similar fate as its opening salvo.

### A. Dr. Bockoff has Shown Irreparable Harm and Further Substantiates such Harm Below

The Opposition apparently believes that Dr. Bockoff has not made a "clear showing" of irreparable harm because he has, and is simultaneously exercising, his option of contesting the revocation of his DEA registration, and denial of future renewals or applications. at an Order to Show Cause Hearing. (Dkt. 20 at 12-13) The expediency of such a remedy is evidenced by the wall of text one must read in the opposition's response to pinpoint the dates this hearing is scheduled for: January 23-26, 2023, and February 6-8, 2023. *Id.*

Beyond the 30 days afforded a registrant to timely file a request for hearing, neither federal law nor DEA regulations establish timeliness standards for the adjudication of orders to show cause and immediate suspension orders. In 2014, the Office of Inspector General ("OIG") reported that while the DEA, in a 2006 memorandum, set a 180-day internal policy goal for itself in actions involving immediate suspension orders, it significantly failed to meet it. Far from achieving its goal, from issuance to final decision, OIG found that between 2008-2012, after receiving the Administrative Law

Judge's ("ALJ") recommended decision, on average it took 203 days for the Office of the Administrator to issue a final decision. In 4 of those 5 years, it took the office of the Administrator more than an average of 180 days to issue a final decision. Office of Inspector General, May 2014, *The Drug Enforcement Administration's Adjudication of Registrant Actions,* (I-2014-003), United States Department of Justice. https://oig.justice.gov/reports/2014/e1403.pdf

Defendants assert that the law affords Dr. Bockoff an adequate remedy for the 100-day deprivation of his DEA registration, from ISO to the final currently set hearing date on February 8, 2023. Defendants ignore the uncertain, additional time required for the ALJ to certify its recommended decision and the Office of the Administrator to issue its final decision before Dr. Bockoff potentially finds relief. Indeed, if this remedy were "adequate", as advertised by the Defendants, why could the DEA not have waited for possible revocation decision of Dr. Bockoff's registration after the Order to Show Cause Hearing? Even if the final decision was issued 203 days after the last day of the scheduled OSC hearing, it would still be less time than the DEA waited between its September 2021 raid on Dr. Bockoff's practice and its immediate suspension of his registration.

The Opposition continues though, and further claims the six-week delay between service of the ISO on Dr. Bockoff and filing his TRO is clear evidence of a lack of irreparable harm. (Dkt. 20 at 13) But, again, this claim is wholly undermined by another case to which it cites. That is, in *Lydo Enters. v. Las Vegas*, the Ninth Circuit held that while "we do give [] [any delay] consideration in measuring the claim of urgency", "we would be loath to withhold relief solely on that ground." *Id.* (citing 745 F.2d 1211, 1213 (9th Cir. 1984)

Also curiously excluded from the Defendants' references to the cited cases relevant to delay in seeking injunctive relief, is the extent of the delay in those cases. Returning to *Lydo Enters.,* the Court here found no irreparable harm occurred to the party claiming such, when it received personal notice in November 1982 of an ordinance but failed to respond until ten days before the following mid-April

deadline, a delay of nearly five (5) months. (745 F.2d at 1214) Although, the Court affirmed the district court's denial of the preliminary injunction, noting the plaintiff "waited months," the finding of no irreparable harm was primarily premised on the disjunction between the remedy sought in "her substantive copyright claim and the dangers she hope[d] to remedy through an injunction." *Garcia v. Google, Inc.,* 786 F.3d 733, 744 (9th Cir. 2015)

Here, though there was some delay, six weeks is certainly not an unreasonable delay and falls shy of the nearly five (5) months as observed in the case relied upon by the opposition. (Dkt. 20 at 13) Undersigned counsel does not and has not represented Dr. Bockoff in relation to the DEA OSC administrative proceedings. Upon the tragic deaths of his patients and the impending destruction of his business, Dr. Bockoff sought alternative advice on another potential, more expeditious, legal remedy.[1] What's more, it seems inappropriate to attribute his other counsel's failure to seek a TRO to Dr. Bockoff – even sophisticated counsel falls short from time to time.

Taking issue with Dr. Bockoff's statement that he "will have to close his practice indefinitely in the next few weeks" given the significant financial harm he has already experienced, the Defendants claim that "[c]ourts in this District routinely reject such naked boilerplate assertions." (Dkt. 20 at 14) Yet it cites to a lone unpublished district court opinion, which rests on a Third circuit opinion, as well as a few other district court cases. *Id.* (citing *Keywords, LLC v. Internet Shopping Enters.*, No. 5-cv-2488, 2005 WL 8156440, at *15 (C.D. Cal. June 29, 2005)). Regardless, Dr. Bockoff has affixed his bank statements to further substantiate the irreparable harm he has already suffered – and will continue to suffer unless his TRO is granted. In September 2022, one year after the complete seizure of funds in his business checking account and one month prior to the ISO, Los Angeles Pain Management Medical Group ended the month with a balance of $101,680.15. Following the November 1st immediate

---

[1] Dr. Bockoff retained Chapman Law Group on November 21, 2022 and filed his application for a TRO on December 15, 2022. Though this was done as expeditiously as possible, records had to be obtained, then reviewed, followed by research and drafting of all civil filing documents, including the TRO.

suspension, the account ended the month with a balance of only $16,850.91. **(See Exhibit C, Wells Fargo statements – Sept. 2021, Oct. 2022 and Nov. 2022)**

The opposition suggests, however, that even if Dr. Bockoff were to substantiate the financial harm suffered, Ninth Circuit precedent instructs that "strictly monetary" injuries are generally not a basis for an injunction. (Dkt. 20 at 14) The relied upon Ninth Circuit cases cite to the same underlying Supreme Court decision that advises "temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury. . . 'The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'" *See Lydo Enters.*, 745 F.2d at 1213 (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)) (citation omitted); *see also Los Angeles Memorial Coliseum Com. v. National Football League,* 634 F.2d 1197, 1202 (9th Cir. 1980) (citing *Sampson,* 415 U.S. at 90)) (citation omitted).

This is not a case where Dr. Bockoff is experiencing a "temporary loss of income." Rather, as identified in Dr. Bockoff's declaration, as well as his bank statements, if his DEA registration is not reinstated, he will have to close his practice indefinitely, making any loss in income permanent. Even if successful in the administrative proceedings, no compensatory or corrective relief is available against the DEA. Coupled with the fact that Dr. Bockoff is 80 years old and unlikely to be able to continue working long enough to financially recover. Therefore, as presented in Dr. Bockoff's TRO, the DEA's ISO is a threat to his practice's "very existence". (See Dkt. 16 at 10 (citing *Bates Drug Stores, Inc. v. Holder*, 2011 U.S. Dist. LEXIS 52404, at *5-6 (E.D. Wash. May 6, 2011) (finding the pharmacy's very existence was at stake given that it would have to close indefinitely if the DEA's immediate suspension continued)).

Nevertheless, Defendants argue that Dr. Bockoff has provided "no evidence that he cannot actually continue to maintain his business or else resume it," should he prevail at the Order to Show Cause Hearing. (Dkt. 20 at 14) Further, asserting that "a doctor who has (by his own assertion)

practiced for decades" should have the financial resources to bankroll his practice through the administrative proceedings. *Id.* This argument is not made in good faith. The Defendants are aware, or should be aware, of the September 16, 2021, IRS seizure of nine hundred thirty-three thousand five hundred seven dollars ($933,507.16) from Dr. Bockoff's business account and an additional nearly one hundred sixty thousand dollars ($160,000) seized from his residence.  Suggesting that Dr. Bockoff *may choose* to close his practice rather than finance it, after seizing such a large majority of his net worth, is short-sighted at best, but more likely can aptly be characterized as disingenuous.

Adding further insult to injury, the opposition then questions Dr. Bockoff's genuine care for his patients, as stated in his TRO, claiming that if his concern regarding the urgent medical risk to his patients was true, he "presumably would have immediately moved for a TRO to effectively facilitate their transition." (Dkt. 20 at 15) It is unclear to Plaintiff how immediately moving for a TRO would facilitate the transition of Dr. Bockoff's patients to other providers.

Rather, one would assume the opposite, given that Dr. Bockoff's renewed ability to continue treating his patients by prescribing the medically necessary controlled medications required.  In any event, as stated in his declaration, Dr. Bockoff has kept his practice open, at a significant personal financial loss, so that he may aid his patients in locating and transitioning to other providers, as well as to not financially abandon his employees at the holidays.  As the Defendants already know, it is the DEA's aggressive – and highly flawed – actions shutting down countless providers across the United States, that force patients with intractable pain to travel across the country to find providers willing to treat them, such as Dr. Bockoff.  Further, in moving on to its next "targets," it is the acceptance of such patients whose previous provider was "shut down," that the DEA itself considers a "red flag" justifying the agency's next administrative suspension and revocation actions.

Lastly, the opposition, in a single sentence, acknowledges the suicide of one of Dr. Bockoff's patients, and the consequential suicide of his spouse, but declares that this actual harm must yield to the

risk of patient suicide and other theoretical harms aggravated by the "history of long-term opiate over-prescribing." *Id.* Notwithstanding the fact that, according to the latest CDC update, opioid prescribing, as well as prescription opioid misuse and prescription opioid use disorders have been declining since 2012, (Dowell D, Ragan KR, Jones CM, Baldwin GT, Chou R. *CDC Clinical Practice Guideline for Prescribing Opioids for Pain* – United States, 2022. MMWR Recomm Rep 2022; Vol. 71 (No. RR-3) ("2022 Guidelines")), a TRO is meant to consider actual harm in the record before the court. *Bates,* LEXIS 52404, at *9-11 (holding a court is limited to the record before it at the time of the DEA's suspension and that it considers actual harm rather than harm that could occur in the abstract); *see also Pom Wonderful LLC v. Pur Bevs. LLC,* 2015 U.S. Dist. LEXIS 176834, at *47-48 (C.D. Cal. 2015) (distinguishing between likelihood of irreparable harm versus actual harm and confirming importance of some sort of tangible harm). So, while the Defendants emphasize that any hardships Dr. Bockoff's patients may endure caused by "his unsafe practices contributing to their opioid dependency and addiction," it cannot point to even one harmed by his prescribing.

It is exactly this rigid, misapplication of the CDC's 2016 "*Guidelines for the Prescription of Opioids for Chronic Pain*" ("2016 Guidelines") by organizations, health care systems and government agencies that prompted the CDC's recommended 2022 Guidelines update, acknowledging these actions contributed "to patient harm, including untreated and undertreated pain, serious withdrawal symptoms, worsening pain outcomes, psychological distress, overdoes, and suicidal ideation and behavior." *Id.* at 3. Case in point, the December 10, 2022 death of another Bockoff patient, Jessica Kujimaki, a wife and mother of two daughters, of apparent complications caused by opioid withdrawal, after being unable to find a doctor in her state to treat her complicated condition. Pat Anson, Pain News Network, *Second Patient Dies After DEA's Suspension of Doctor's License,* (Dec. 15, 2022) https://www.painnewsnetwork.org/stories/2022/12/14/second-patient-dies-after-deas-suspension-of-doctors-license-nbspnbsp.  **(See also, Exhibit D, Intervenors Statements at # 9)**

### B. Dr. Bockoff is Likely to Succeed on the Merits because the DEA's Immediate Suspension Was Arbitrary and Capricious

The Opposition incorrectly claims Dr. Bockoff's only argument in support of the arbitrary and capricious suspension was his erroneous assertion that the finding of imminent danger was solely based on deficiencies in his medical records, and therefore, will fail. (Dkt. 20 at 16)

Dr. Bockoff acknowledged in the TRO that the DEA's subject matter expert reported he prescribed excessive doses of opioids in dangerous combinations without an appropriate medical examination, while failing to adequately monitor and discuss with patients the risks associated with use of the same. (Dkt. 16 at 5) He just emphatically denies the expert's findings, in both form and function.

At the execution of the search warrant, the DEA provided a list of 240 patients whose hard copy medical records were seized from Dr. Bockoff's office. **(See Exhibit E, DEA Search Warrant Patient List)** After scanning and creating a digital copy of the records, DEA Diversion Investigator (DI) Stephanie Woolley then provided 30 patients' records to Dr. Timothy Munzing for review.[2] (Dkt. 20-6 at 5) From those 30 reviewed, he opined that controlled substance prescriptions issued to 5 of those patients, documented in the ISO, were not medically justified, citing the reasons above, he declared Dr. Bockoff failed to follow the standard of care. It is Dr. Munzing's opinion regarding roughly 16% of the patient records provided to him, from the 2% seized by the DEA, as the only evidence proffered by Defendants that render its ISO arbitrary and capricious.

Most damaging to the Defendants, is the fact that its opposition, including the opinion of its expert, completely rely on the misapplications specifically addressed and admonished against in its 2022 Guidelines update; notably, the "central tenet of the guidelines that the recommendations are

---

[2] Based on the proposed testimony of DI Woolley, it is unclear if Dr. Munzing was provided complete patient files. The seized paper records included prior medical records, labs, imaging reports, prescriptions, insurance authorizations, and handwritten notes by Dr. Bockoff. However, the clinic also utilized electronic medical record software ("EMR") which contains both electronically entered patient encounter notes and scanned copies of paper records received. There is no mention in the record of these being provided to the DEA expert.

voluntary and intended to be flexible to support, not supplant individualized, patient-centered care" and going beyond its recommendations with "abrupt discontinuation, rigid application of opioid dosage thresholds and duration limitations." *Id.* at 3. What neither the 2016. nor the 2022 guidelines, do is "direct" or "instruct" clinicians as suggested by the ISO. (Dkt. 20-3 at 3) Rather they are "[r]ecommendations [that] should not be applied as inflexible standards of care across patient populations." (2022 Guidelines Summary) Finally, Dr. Bockoff is likely to succeed on the merits because, in addition to the noted misapplications, the intended scope and audience of the 2016 Guidelines were "primary care clinicians…considering prescribing opioid pain medications for painful conditions that can or have become chronic." *Id.* at 3. Neither of which are applicable to Dr. Bockoff.

Even when applying the 2016 Guidelines, Dr. Munzing's repeated attention to the morphine milligram equivalent ("MME") prescribed to the patients, relied upon in the ISO, is inapplicable and misleading when excluding the entirety of the recommendations and Dr. Bockoof's compliance therewith. Acknowledging that increased dosages increased risks, the 2016 guidelines recommended primary care physicians initiate opioid treatment at the lowest effective dosage but "as dosages approach 90 MME/day…consider consulting a pain specialist." *Id.* at 23.

Dr. Bockoff is a pain specialist and, although disregarded by the opposition, essentially followed the other 2016 recommendations related to long-term opioid therapy and higher dosages. He employed shorter follow-up intervals – monthly patient visits; required patients be evaluated for risk factors other mental health conditions; offered naloxone; frequently California's prescription drug monitoring program ("CURES")[3]; and utilized urine drug screens, more often than the recommended annual assessment.

Similarly, in Dr. Munzing's opinion that Dr. Bockoff prescribed opioids without conducting appropriate examinations, such as a physical evaluation of his patients (Dkt. 20 at 16-18), the DEA

---

[3] Almost monthly CURES reports were in the scanned patient records provided to Dr. Munzing.

subject matter expert ignores the public guidance by the Secretary of Health and Human Services, and the DEA itself, issued during the COVID-19 pandemic. **(See Exhibit F, How to Prescribe Controlled Substances During the COVID-19 Public Health Emergency**) Specifically, permitting physicians to conduct follow-up evaluations to established patients and issue controlled substance prescriptions "in-person, or via telemedicine, telephone, email, etc." *Id.*

Finally, though the Opposition argues that the ISO "provides extensive alarming detail on just how dangerous Dr. Bockoff's prescribing practices are," it never explains how the listed practices have not resulted in any actual harmful consequence to a patient. *Id.* at 16-18 (confirming the ISO is "supported by over three years' worth of Dr. Bockoff's records") Therefore, failing to support a finding of imminent danger. Beyond the already refuted and misapplied emphasis on MME and the general risks of "diversion and abuse," the ISO provides little credible support.

The general assessment by Dr. Munzing of each patient's record, from his proposed testimony, that Dr. Bockoff prescribed controlled substances without conducting a proper medical evaluation (overlooking the examination notes in the EMR), without obtaining informed consent (discounting the multiple initialed and signed informed consents at varying treatment intervals located in patient files), without mitigating the risks of addiction and diversion (ignoring references in the EMR encounter notes to UDS results obtained that day or recently, as well as the daily UDS logs) and without properly monitoring patient compliance (contrary to acknowledging the prescriptions were issued on a monthly basis but disregarding the annotated CURES reports), is not borne out by the complete patient records. (Dkt. 20-6 at 9-16) Responses to patient specific grievances identified by the opposition:

- B.B. – The aberrant UDS noted in ISO indicated positive for THC and were noted in the file. Has been a patient of Dr. Bockoff's for various periods of time since 2012. Function improvement noted in his ability to sit at a computer to perform his duties as an attorney.

- E.C. – Proposed testimony that the type of fentanyl, Actiq Lozenges, has approved usage for breakthrough cancer pain. As indicated in her email attached to Plaintiff's TRO,

E.C. suffers from "chronic pancreatic pain akin pancreatic cancer pain." (Dkt. 16-5) The lozenge is easier on her digestion than tablets or capsules. Improvement in function observed in her ability to continue her work as a personal injury litigator.

**C. The Balance of Equities Tilt Sharply in Dr. Bockoff's Favor and Injunctive Relief if in the Public Interest**

The Defendants fill this section citing case law and articles in support of its authority to suspend a registrant's DEA registration where there is "imminent danger to the public health and safety" repeating the refrain of detrimental effects opioids and Government interest in preventing diversion. (Dkt. 20 at 18-19) But again, provide no evidence of the detrimental effects to Dr. Bockoff's patients or suspected diversion related to his controlled substance prescriptions. Even though the DEA posits that he has been "habitually" prescribing controlled substances in "alarmingly" high dosages in dangerous combinations, it fails to point to one example, among the 240 patient records seized, of the devasting consequences of abuse or addiction identified. Yet, it is the perceived "acute" and theoretical danger to the public, not the actual ultimate harm inflicted upon the three deceased patients, or the continued suffering of Dr. Bockoff's pain patients, the Government misguidedly seeks to protect. *Id*.

Dr. Bockoff would encourage the Defendants adjust its priorities and remind them that Schedule II opioids, though not without risk, have therapeutic value in treating individuals tormented with pain. And further persuade the DEA to expand its myopic approach, stop villainizing the doctors trying to "do no harm" and cease weaponizing its mistaken interpretation of the guidelines, as the CDC has recommended. It is these actions that are putting the public in imminent danger.

Dr. Bockoff issued controlled substance prescriptions to these patients to treat their long term chronic intractable pain. He did so for the individualized medical purpose of each within the usual course of his professional practice. Moreover, the prescriptions were issued in accordance with the 2022 CDC Guideline recommendations, before they were even recommended, evaluating the benefits against the potential harms, monitoring his patients' tolerance, compliance and functional improvement,

all while mitigating the risks.

While Dr. Bockoff can appreciate that potential harm associated with opioid therapy, it is the actual irreparable harm to his patients and business he seeks to prevent with this TRO. This actual harm that has already befallen two of his patients is alone sufficient to substantiate the likely future harm if the immediate suspension of his DEA registration is not dissolved. *See Pom Wonderful LLC,* LEXIS 176834, at *46-48 (holding "one way to show a likelihood of future irreparable harm is to show that there has, to date, been some actual confusion or harm...[] Ninth Circuit [] [case law] indicates that in many instances, some evidence of actual confusion or actual harm [] tipp[s] the scales in favor of a finding of likely irreparable harm in the absence of an injunction."); *see also Oak Hill Hometown Pharm. v. Dhillon,* 418 F. Supp. 3d 124, 133 (S.D.W. Va. 2019) (dissolving DEA's immediate suspension order and holding the "imminent danger to public health and safety" that will result if a provider's registration to prescribe controlled substances is suspended must also be assessed). For these reasons, the equities tip sharply in Dr. Bockoff's favor, and the public interest is best served by granting him a TRO.

## CONCLUSION

For the foregoing reasons, this Court should grant Dr. Bockoff's Application and issue a TRO dissolving the DEA's suspension his controlled substance registration.

Dated: December 27, 2022

By: /s/ Summer McKeivier
Summer McKeivier, CA #230605

*Attorneys for Plaintiff
David Bockoff, M.D.*